UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOHNNY A. VAUGHAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 10-2184 (ABJ) |
| | ) | |
| AMTRAK, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter is before the Court on plaintiff's partial motions for summary judgment [Dkt. #30, 42] and defendant's cross-motion for summary judgment [Dkt. #35]. For the reasons discussed below, the Court will deny plaintiff's motions for summary judgment and grant defendant's cross-motion for summary judgment.

**I. BACKGROUND**

In September 2008, plaintiff, a white male born in 1950, applied but was not selected for the position of Lead Service Attendant ("LSA") with the National Railroad Passenger Corporation ("Amtrak"). *See* Compl. ¶¶ 3–4. According to plaintiff, Amtrak's decision not to hire him "was discriminatory because it was based on [his] race and/or age." *Id.* ¶ 5. He brought this action under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*[1]

---

1   In Plaintiff['s] Motion for Partial Summary Judgment [Dkt. # 30] ("Pl.'s Mot."), plaintiff purports to raise, for the first time, a claim under the Vietnam Era Veterans Assistance Act ("VEVRAA"), *see* 38 U.S.C. § 4212, by alleging discrimination based on his status as a veteran of the Vietnam war. At that stage of proceedings, Amtrak already had filed its Answer. Plaintiff could have amended his complaint "only with the opposing party's written consent or the court's

1

### A. Plaintiff's Allegations

"Plaintiff applied for a job as Lead Service Attendant (LSA) which duties include serving food on a train." Pl.'s Mot. for Partial Summ. J. [Dkt. #30] ("Pl.'s Mot.") at 3. In relevant part, the LSA position description reads:

> The Lead Service Attendant . . . is primarily responsible for creating a welcome atmosphere of hospitality for Amtrak passengers that result[s] in exceeding customer expectations. Works in a fast-paced environment on board trains. Coordinates work and supervise[s] a team of food and wait staff responsible for the provision of food and beverage service to Amtrak passengers . . . . May also work independently in certain services with no supporting staff . . . . Maintains cleanliness of rail car interior . . . . Functions independently while simultaneously supporting the service staff. Utilizes superior interpersonal skills to communicate clearly and effectively with passengers and crew to insure employee and customer satisfaction in both ideal and off schedule conditions . . . . Responsible for the security, sale, safe handling and accounting of food and beverage products. Strictly complies with cash and credit transaction handling procedures and protects Amtrak funds . . . . Adheres to uniform and grooming requirements[.]

*Id.*, Ex. D (excerpt from Job Posting, AMT-VAUGHAN 000211). The position required a high school diploma or equivalent; some college or vocational training was preferred. *Id.* With respect to work experience, the posting read:

> Some experience in a customer service or similar public contact role exhibiting responsibility, initiative, physical coordination, problem solving, creativity, and leadership characteristics. Work experience must demonstrate strong, clear and effective verbal communication and interpersonal skills, professionalism, and a customer-friendly demeanor . . . . Prior experience working in a team service environment preferred. Some experience in a food/beverage environment, cash handling, and retail inventory

---

leave." Fed. R. Civ. P. 15(a)(2). Had he sought the Court's leave to amend the complaint, he would have been required to file "[a] motion for leave to file an amended complaint . . . accompanied by an original of the proposed pleading as amended." LCvR 15.1. Amendment of the complaint would have been futile, however, because there is no private right of action under the VEVRAA. *See, e.g., Wilson v. Amtrak Nat'l R.R. Corp.*, 824 F. Supp. 55, 58 (D. Md. 1992).

>       experience preferred.   Supervisory experience in the Hotel,
>       Restaurant and/or Travel, Hospitality industries preferred.

*Id.*, Ex. D.

Plaintiff understood the "job description to include over 80% . . . food handling [and] customer service," and emphasized its preference for "[s]upervisory experience in the Hotel, Restaurant and/or Travel, Hospitality Industries." Pl.'s Mot. at 3. As indicated on his resume, plaintiff has managed restaurants, served as the food and beverage director for a hotel, and managed the daily operations at a banquet venue. *Id.*, Ex. E (plaintiff's resume, AMT-VAUGHAN 000214-215). Plaintiff not only considered himself qualified for the position, but also believed that "his experience 'outshone' all other candidates." Pl.'s Mot. at 4. "[B]ased off the job duties and educational requirements and [plaintiff's] experience, [he] could not comprehend that there possibly could be 15 people that had more experience of doing this job than [him] at that time." Mem. of Law in Supp. of Def.'s Opp. to Pl.'s Mot. for Partial Summ. J. & Def.'s Cross-Mot. for Summ. J. [Dkt. ## 34–35] ("Def.'s Cross-Mot."), Ex. 3 ("Pl.'s Dep.") at 84:14–18. His "experience as related to the job posting exceed[ed] the supervisory & food and beverage experience of all 10 alleged applicants hired combined," Pl.'s Mot. for Partial Summ. J. for Violation of Title VII Rights ("Pl.'s 2d Mot.") at 4; *see* Pl.'s Mot. at 3, yet Amtrak "hired younger, lesser qualified individuals that were mostly African Americans after rejecting the Plaintiff." Pl.'s 2d Mot. at 2; *see* Pl.'s Mot. at 2.

Plaintiff posits that Amtrak "hire[d] other applicants based on job criteria that is [sic] not listed in the job posting," and deems this "evidence of willful and wanton behavior . . . with a wrongful motive and reckless indifference to plaintiffs' [sic] rights." Pl.'s Mot. at 4. He claims to have "established a *prima facie* case of discrimination" based on his age and race, and that

Amtrak "failed to articulate a legitimate non-discriminatory reason for its actions." Pl.'s 2d Mot. at 12.

### B. Amtrak's Representations

1. <u>Hiring Procedure for the LSA Position</u>

"Amtrak was created by Congress in 1970 to take over the passenger rail services previously . . . operated by private freight railroad companies in the United States." Def.'s Cross-Mot., Ex. 4 ("Ray Aff.") ¶ 3. Its Human Resources ("HR") department "handles the recruiting for any vacancies . . . for all departments including, but not limited to, mechanical, marketing, and transportation." Ray Aff. ¶ 4. "Recruitment processes vary by position," and "[i]n 2008, the recruiting process for the [LSA] position followed a Transportation Hiring Plan that provided the number of vacancies for which [Amtrak was] to recruit over the fiscal year." *Id.*, Ray Aff. ¶ 5. HR posted the LSA position on Amtrak's Career Rewards website; its staff attended job fairs, accepted referrals from local representatives and current employees, and accepted resumes by mail and other means. Ray Aff. ¶ 6. Amtrak received more than 800 applications for the LSA position for which plaintiff applied. Ray Aff. ¶ 8. In such circumstances with so many applicants, "it [was] unlikely that all applications would be reviewed" because HR "simply [did] not have the resources to review all 800 applications." Ray Aff. ¶ 8.

After receiving resumes, "[a] recruiter would review [them] to determine whether the candidates met the position's minimum qualifications, and if there were any 'red flags' (i.e. unexplained gaps in employment)." Ray Aff. ¶ 9. Candidates who met the minimum qualifications and for whom no "red flags" were identified were "invited to test for the position." *Id.*, Ray Aff. ¶ 9. Each candidate was "given an orientation [during which HR] describe[d] in

4

detail the position for which [he] applied." Ray Aff. ¶ 10.  If the candidate chose to proceed with the application process, he took "a math test, a vocabulary test, and an Applicant Potential Inventory test." Ray Aff. ¶ 10.  The applicant had to pass all tests to be eligible for an interview. Ray Aff. ¶ 10.  Plaintiff was one of ten applicants who both met the minimum qualifications for the LSA position and passed the required tests.  Ray Aff. ¶ 14.

Generally, two managers conducted each interview.  Ray Aff. ¶ 12.  "The managers [did] not choose whom to interview; they interview[ed] those candidates selected by [HR] who [were] deemed] minimally qualified for the position and who [had] passed the required tests." Ray Aff. ¶ 11.  Interviewers did not know the candidates' test scores.  Def.'s Cross-Mot., Ex. 1 ("Baylor Aff.") ¶ 5.  HR provided the managers with written interview questions so that each candidate was asked the same questions, Ray Aff. ¶ 11, and the managers were allowed to take notes, Baylor Aff. ¶ 6.  After an interview, "the managers return the applicant materials, interview questions, and any notes they took during the interview[] to [HR]," and at that time they "inform HR of who they selected for the position."  *Id.*, Ray Aff. ¶ 13.

The LSA "position is primarily a customer service job."  Def.'s Cross-Mot., Ex. 2 ("Brewer Aff.") ¶ 4; Baylor Aff. ¶ 4.  Interviewers are particularly interested in a candidate "who wants to and is capable of providing the high-quality customer service that Amtrak customers expect."  Baylor Aff. ¶ 8; Brewer Aff. ¶ 4.  LSAs "are not simply responsible for serving food and beverages on a train;" shifts can last as long as "18 hours in a fast-paced environment," and LSAs can spend as many as six days per week away from the home base.  Brewer Aff. ¶ 4. Although LSAs "are responsible for coordinating and supervising the work of a team of food and wait staff who provide food and beverage service to Amtrak's passengers," Baylor Aff. ¶ 4, food service or management experience is therefore preferred, but it is not required for the LSA

5

position.  Baylor Aff. ¶ 8; Brewer Aff. ¶ 4.  "More important are the intangible qualities like personal presentation, verbal communication skills, approachability, flexibility, and a willingness and desire to perform the job."  Baylor Aff. ¶ 8.  LSAs "must be approachable and welcoming, even in difficult situations."  Brewer Aff. ¶ 9.

Two Amtrak managers, Patricia Baylor and Kathy Brewer, interviewed plaintiff on September 10, 2008.  Baylor Aff. ¶ 9; Brewer Aff. ¶ 10.  For Ms. Baylor, the interview was an opportunity "to assess . . . an LSA candidate by observing how the candidate presents himself[], how he[] responds to the interview questions, demeanor, eye contact, facial expressions, posture, preparedness and dress," and to "differentiat[e] between those candidates who just look good on paper and those who have the customer service skills to succeed as an LSA."  Baylor Aff. ¶ 8. Because "Amtrak thoroughly trains employees in all job functions, . . . intangible qualities like personal presentation, verbal communication skills, approachability, flexibility, and willingness and desire to perform the job" are more important than food service, catering, or restaurant experience.  Baylor Aff. ¶ 8.  Similarly, Ms. Brewer "look[s] for candidates who appeared interested and comfortable in the interview, maintained eye contact and smiled during the interview, and demonstrated a customer service focus."  Brewer Aff. ¶ 9.  By "focusing on attitude and personality," she could "separate those candidates who appeared great on paper from those who could perform great on the trains."  *Id.*, Brewer Aff. ¶ 9.

Hiring decisions were made on a rolling basis; the interviewers did "not wait . . . until all of the candidates [were] interviewed."  Baylor Aff. ¶ 7.  The interviewers "did not revisit those candidates who [were] determined . . . not a good fit after their interview[s]."  Brewer Aff. ¶ 8; Baylor Aff. ¶ 7.

2. <u>Plaintiff's Interview</u>

Ms. Baylor described the interview as follows:

> When [plaintiff] arrived for the interview on September 10, 2008, he was not "polished," meaning, he did not look professional. As an interviewer, I generally expect candidates to come dressed appropriately for an interview (and for the job). I do not recall that [plaintiff] was wearing a tie, and his overall presentation was not business-like.
>
> During the interview, [plaintiff] made it clear that he was more interested in a position with the Food and Beverage department than the LSA position for which he was interviewing. The Food and Beverage department serves as a liaison between Amtrak and its vendor, ARAMARK, to ensure the quality of food Amtrak offers. Food and Beverage positions are management positions in another department; they are not onboard service[] positions and do not involve the level of customer service required of an LSA. Specifically, I remember [plaintiff] commented that he wanted a Food and Beverage position, but none were available at that time.
>
> [Plaintiff's] behavior during the interview also indicated to me that he would not be a successful LSA. Rather than listen to and answer the questions that were asked in the interview, [plaintiff] just provided the information he wanted to provide. In so doing, [he] acted like he wanted to take charge of the interview – to be the manager/interviewer—which I found to be arrogant. In addition, his eye contact was poor, he did not seem approachable, and his manner was condescending.

Baylor Aff. ¶¶ 10–12. Ms. Brewer's observations were similar:

> Although he applied for a position with significant customer contact, [plaintiff's] appearance at the interview was not professional or polished. I recall that his fingernails were dirty and his shoes were not polished, and I do not recall that he wore a jacket or tie. In interviewing candidates for LSA positions, I expected that they would attend their interviews dressed appropriately and present in a business-like manner – others did, [plaintiff] did not.
>
> In addition, based on his behavior during the interview, I did not believe that [plaintiff] would be able to perform successfully as an LSA. Throughout the interview, [he] seemed much more interested in telling his own story and relaying the information that

7

> he wanted to relay, rather than in answering the questions. He did not seem to listen to the questions asked and did not maintain eye contact. In my opinion, [plaintiff] acted like he was in charge of the interview, which gave me the impression that he was full of himself.

Brewer Aff. ¶¶ 11, 13.

Ms. Baylor recalled a "strange and very inappropriate" comment plaintiff made during the interview, which she described as follows:

> [Plaintiff] described a situation when he was managing a restaurant and Jewish customers told him that they did not want Black people serving them, and in response, he threw the Jewish customers out. In describing this situation, [plaintiff] repeatedly used the terms "the Blacks" and "the Jews." It was unclear . . . why [plaintiff] related this experience, as it was not particularly responsive to any of the questions asked[.] [M]y impression was that because Ms. Brewer and I are both African-American, [plaintiff] felt it necessary to try to indirectly convey that he was okay working with African-Americans or that he was sensitive to racial issues involving African-Americans. What the comment conveyed to me, however, was that [plaintiff's] judgment was poor and that he did not have the kind of customer service skills we were looking for.

Baylor Aff. ¶ 13. Ms. Brewer had a similar reaction to plaintiff's comments. During plaintiff's description of the incident, using "the terms 'the Blacks' and 'the Jews,'" she interrupted plaintiff "and told him something to the effect of, 'we don't speak like that at Amtrak.'" Brewer Aff. ¶ 14. She "got the impression that because both [interviewers] are African-American, he was trying to show some form of camaraderie – that he was comfortable working with African-Americans." Brewer Aff. ¶ 14. She not only found "the comments to be inappropriate, [but] also thought the sentiment . . . was insincere." Brewer Aff. ¶ 14. Aside from this incident, there was no "discuss[ion of plaintiff's] or anyone else's race or age." Brewer Aff. ¶ 15; Baylor Aff. ¶ 14. Neither interviewer knew plaintiff's age at the time of the interview, and both believed plaintiff to be Caucasian. Brewer Aff. ¶ 15; Baylor Aff. ¶ 14.

   3.   Amtrak's Hiring Decision

A hiring decision was based on the candidate's "total package," that is, the candidate's resume and interview. Brewer Aff. ¶ 8; Baylor Aff. ¶ 7. The interviewers jointly decided "whether . . . the candidate is a good fit for the LSA position," Brewer Aff. 8; Baylor Aff. ¶ 7.

Based on plaintiff's "extremely poor performance during the interview, including his unpolished appearance, arrogant demeanor, failure to answer interview questions, inappropriate comment, poor communication skills, and lack of interest in the LSA position," Ms. Baylor concluded that he would not "provide the customer service approach required of an LSA." Baylor Aff. ¶ 15. For these same reasons, based on plaintiff's "overall poor interview performance," Ms. Brewer concluded that plaintiff "lacked the customer service personality required for an LSA. Brewer Aff. ¶ 16. She, too, noted plaintiff's "failure to answer the interview questions, poor judgment, poor communication skills, inappropriate comments, unprofessional appearance, self-important attitude, and his apparent lack of interest in the LSA position." Brewer Aff. ¶ 16. Neither interviewer considered plaintiff's race or age in reaching her decision. Brewer Aff. ¶ 16; Baylor Aff. ¶ 15.

Ms. Brewer acknowledged that plaintiff "had more work experience in the restaurant/food service industry than each of the ten successful candidates." Brewer Aff. ¶ 19. She explained her selection of other candidates as follows:

> [T]he ten (10) successful candidates all out-performed [plaintiff] in the interviews. The individuals selected for the LSA position all demonstrated . . . that they had the appropriate approach to customer service and would be a good fit for the position. . . . [W]hile prior experience in restaurants and food/beverage is helpful, the most important factors in selecting a candidate for an LSA position are approach to customer service, attitude and personality – everything else can be taught. All ten (10) of the candidates selected over [plaintiff] demonstrated that they were more qualified for the LSA position because they were a better fit in these areas.

9

Brewer Aff. ¶ 19. The races and ages of the successful candidates were:

> Candidate 1 (Hispanic, 34); Candidate 2 (African-American, 32); Candidate 3 (Asian, 28); Candidate 4 (African-American, 32); Candidate 4 (African-American, 25); Candidate 6 (African-American, 36); Candidate 7 (African-American, 51); Candidate 8 (African-American, 37); Candidate 9 (Caucasian, 28); Candidate 10 (African-American, 37).

Ray Aff. ¶ 15.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). To determine which facts are material, a court must look to the substantive law on which each claim rests. *Anderson*, 477 U.S. at 248.

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Sherwood v. Washington Post*, 871 F.2d 1144, 1148 n.4 (D.C. Cir. 1989), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982). In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

Where a plaintiff proceeds *pro se*, "the Court must take particular care to construe the plaintiff's filings liberally, for such complaints are held 'to less stringent standards than formal pleadings drafted by lawyers.'" *Cheeks v. Fort Myers Constr. Co.*, 722 F. Supp. 2d 93, 107 (D.D.C. 2010), quoting *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972).

In an employment discrimination case, on the parties' cross-motions for summary judgment, the Court must address one question:

> Has the [plaintiff] produced sufficient evidence for a reasonable jury to find that [Amtrak's] asserted non-discriminatory reason was not the actual reason and that [Amtrak] intentionally discriminated against [him] . . . .

*Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008), citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507–08 (1993). For a Title VII claim, the focus is on two elements for an employment discrimination case: "(i) the plaintiff suffered an adverse employment action (ii) because of [his] race." *Id.* at 493. The same analysis applies to an ADEA claim, *see O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 310-11 (1996); *Pacquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 26 (D.C. Cir. 1997) ("In ADEA cases we apply the familiar three-step burdenshifting framework announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), for Title VII cases."), but a plaintiff must show that he suffered

an adverse employment action because of his age. Both elements are required to sustain a claim of discrimination. *Brady*, 520 F.3d at 493; *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (applying *Brady* to ADEA claim).

### B. Plaintiff Fails to Rebut Amtrak's Nondiscriminatory Explanation for its Hiring Decision[2]

There is no genuine issue in dispute as to five material facts: (1) plaintiff is a white male; (2) for purposes of the ADEA he is a member of a protected class;[3] (3) plaintiff was qualified for the LSA position; (4) plaintiff suffered an adverse employment action; and (5) individuals who are neither white nor members of plaintiff's protected class were selected for the LSA position for which plaintiff applied.

Amtrak did not select plaintiff for the LSA position based on his performance during the interview. Both interviewers remarked on plaintiff's unprofessional and unpolished appearance, his demeanor, and other intangible qualities deemed unsuitable for the intense customer service

---

2     Plaintiff inexplicably relies on statements and events by Amtrak employees who played no role in the decision not to hire him and which occurred after Amtrak made its hiring decision. For example, plaintiff submitted a complaint to Amtrak's Dispute Resolution Office, which investigated the matter and found no evidence, and plaintiff provided none, suggesting that race or age was a factor in the hiring decision. *See* Pl.'s Mot., Ex. B (Letter to plaintiff from Lisa Alvarado Coleman, Senior Dispute Resolution Officer, DRO, Amtrak, dated January 26, 2009, AMT-VAUGHAN 000441-443). He also finds fault with Amtrak's response to his complaint to the Equal Employment Opportunity Commission denying the claim of discrimination. *See id.*, Ex. C (Letter to Mindy E. Weinstein, Acting Director Washington Field Office, EEOC, from Theodore M. Campbell, Sr. EEO Compliance, Labor and Employment, Amtrak, dated June 10, 2009, AMT-VAUGHAN 00584-586). The relevance of these submissions in unclear.

3     As a white male, plaintiff is not considered a member of a protected class for purposes of his Title VII claim. *See Harding v. Gray*, 9 F.3d 150, 153 (D.C. Cir. 1993). Instead, he is expected "to show additional 'background circumstances [that] support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" *Id.*, quoting *Parker v. Baltimore & Ohio R.R.*, 652 F.2d 1012, 1017 (D.C. Cir. 1981) (alteration in original). For example, a plaintiff may introduce "evidence that the particular employer . . . has some reason or inclination to discriminate invidiously against whites, . . . [or] there is something 'fishy' about the facts of the case at hand that raises an inference of discrimination." *Id.* (citations omitted).

role an LSA plays on board Amtrak's passenger trains. Neither interviewer found plaintiff to have the verbal communication skills, good judgment, or particular willingness to perform the LSA job.

Plaintiff maintains that he was qualified for the LSA position, that he was 57 years old at the time he applied for the position, and that younger, less qualified applicants were selected instead. Pl.'s Mot. at 7. These facts are not disputed. He further asserts that his "experience as compared to the requirements on the job posting not only exceeded individual applicants but his food and beverage customer services exceeded all 10 alleged hired applicants['] combined experience." Pl.'s 2d Mot. at 7. Plaintiff argues that Amtrak's reliance on subjective assessments of personality and a determination by the interviewers that a candidate is a "good fit" for the LSA position are pretextual. *See id.* at 15. He opines that neither interviewer "considered the value of someone trained in food handling and food storage procedures . . . [and] sanitation procedures," *id.*, for example, while "not car[ing] what skills to assess in order to fill the position with the most qualified candidate," *id.* at 16. Fundamentally, plaintiff asserts, Ms. Brewer "did not like" him, *id.* at 16, and that she and Ms. Baylor "devalued organizational values and . . . experience," *id.* at 17. Plaintiff dismisses as "absurd" any company hiring plan to recruit the most qualified candidates for a position which "ignor[es] the experience and educational requirements or . . . laws by not identifying members of a protected class and replace those requirements with a congenitally contest."[4] *Id.* at 28.

In support of his motion for summary judgment on his ADEA claim, plaintiff relies on the job posting, his resume, and a document listing the ten successful applicants' names, ages, races, supervisory and food and beverage experience (if any), and education. *See* Pl.'s Mot. at 4;

---

4   The Court presumes that plaintiff intends to use the term "congeniality contest," not "congenitally contest."

*see id.*, Ex. D-G. With respect to his Title VII claim, plaintiff relies on the "EEOC Compliance manual Section 15." Pl.'s Mem. of Law in Opp. to Def.'s Cross-Mot. for Summ. J. & in Supp. of Pl.'s Partial Summ. J. at 3; *see id.*, Ex. A (EEOC Directives Transmittal No. 915.003 dated April 19, 2006). This document appears to be a revision to the EEOC's Compliance Manual concerning employer credibility. According to this document, "[i]f an employer's explanation for the employee's treatment ultimately is not credible, that is powerful evidence that discrimination is the most likely explanation." *Id.*, Ex. A at 1. Plaintiff appears to argue that, if Amtrak purports to hire the most qualified candidates, and if his experience far exceeded that of the successful candidates, Amtrak's explanation for its decision not to hire him is not credible – meaning that discrimination is the most likely explanation for its action.

There is no dispute that plaintiff was qualified for the LSA position. He proceeds, however, as if rigid adherence to the criteria set forth in the job posting is the only acceptable basis for hiring a particular candidate. *See Kranz v. Gray*, 842 F. Supp. 2d 13, 22 (D.D.C. 2012) (noting that "plaintiff's focus on his 'outstanding' qualifications misses the mark because defendant's reason is not that [plaintiff] lacked credentials, but rather, he provided inadequate essay responses"). Without question work experience is a factor to consider, but nothing in the ADEA and Title VII prevents an employer from considering intangible qualities in making an employment decision. *See Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183–84 (D.C. Cir. 1996) ("[S]electing a pool of qualified candidates based upon their written credentials and then making a final selection based upon personal interviews is an obviously reasonable method of hiring a professional employee."); *Bailey v. Washington Metro. Area Transit Auth.*, 810 F. Supp. 2d 295, 303 (D.D.C. 2011) (selecting an applicant who "conducted herself more impressively during the interview" than the plaintiff); *Onyewuchi v. Mayorkas*, 766 F. Supp. 2d 115, 121

(D.D.C. 2011) (finding that defendant presented legitimate, non-discriminatory justification for plaintiff's non-selection: that plaintiff was less qualified and did not interview as well as the selectee); *Oliver v. Napolitano*, 729 F. Supp. 2d 291, 201 (D.D.C. 2010) (explaining that selectee was "more qualified" for the position "based on her interview" and that she "seemed 'more aware of what [the Department was] looking for and how her skills would add to the office'") (alteration in original).

Plaintiff misunderstands his obligation here. His success on summary judgment depends on his ability to point to evidence in the record to show that Amtrak's stated reason for not selecting him for the LSA position – poor interview performance – is pretextual. *See Brady*, 520 F.3d at 494. Amtrak's burden is "one of production, not persuasion." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). It need only articulate a legitimate nondiscriminatory reason for its hiring decision and offer admissible evidence in support of that reason. *See id.* Amtrak has done so in this case. Plaintiff fails to point to evidence in the record to rebut Amtrak's explanation by showing that race and age discrimination were the actual reasons for the hiring decision. Instead, plaintiff relies on his own statements, opinions, and assessment of his interview performance and the competence of the interviewers. In light of plaintiff's failure, defendant's cross-motion for summary judgment will be granted. *See Andrum v. Washington Metro. Area Transit Auth.*, 710 F. Supp. 2d 112, 119-20 (D.D.C. 2010) (granting summary judgment for employer where plaintiff "ha[d] not presented a single argument or piece of evidence" that the employer enforced a policy based on plaintiff's race). "Short of finding that the employer's stated reason was indeed a pretext, however–- and here one must beware of using 20/20 hindsight – the court must respect the employer's unfettered discretion to choose among qualified candidates." *Fischbach*, 86 F.3d at 1183.

### III. CONCLUSION

Amtrak has demonstrated a legitimate nondiscriminatory reason for its decision not to hire plaintiff for the LSA position, and plaintiff has not rebutted Amtrak's showing. Accordingly, the Court will deny plaintiff's motions for summary judgment [Dkt. # 30 and # 42] and grant defendant's cross-motion [Dkt. # 35]. A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: September 21, 2012